IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Ciena Healthcare Management, Inc.; and          Case No. 3:22-cv-00438-JGC
Laurel Healthcare Holdings, Inc.,

         Plaintiffs,

v.                                  **ORDER**

Hartford Fire Insurance Company,

         Defendant.

This is an action for breach of insurance contract and declaratory judgment. Plaintiffs

operate and manage long-term rehabilitation and nursing care facilities in Ohio (Laurel

Healthcare Holdings) and Michigan (Ciena Healthcare Management), among other states.

Defendant Hartford Fire Insurance Company provided commercial property insurance policies

covering Plaintiffs' Michigan and Ohio facilities.

Pending is Defendant's Rule 12(b)(6) Motion to Dismiss (Doc. 21), Plaintiffs' Response

in Opposition (Doc. 22), Defendant's Reply (Doc. 23), and Plaintiffs' Surreply (Doc. 25).

Plaintiffs seek coverage for business losses during their 2020 shutdown in compliance

with COVID-19–related gubernatorial orders. Plaintiffs base their claims for coverage on

provisions they contend are ambiguous and therefore should be construed in their favor.

Defendant rejects that contention.

For the reasons that follow, I deny Defendant's motion.

**Background**

Plaintiffs' facilities provided skilled healthcare for thousands of elderly and infirm

residents who are partially or entirely incapable of caring for their own health. (Doc. 1, ¶¶ 10–

11). For the year beginning January 1, 2020, Plaintiffs each had insurance coverage under commercial property policies issued by Defendant.[1] Plaintiff Ciena paid an advance premium of $567,450 for its annual policy (Doc. 1-1, Policy No. 33UFJAE2GS0). Plaintiff Laurel paid $645,050 for its annual policy (Doc. 1-2, Policy No. 33UFJZL7900).

The two policies and the coverage they provided were very similar. These policies covered, among other things, certain damages and loss resulting from communicable disease outbreaks and contaminations as well as the government orders directed at such events.

In early 2020, a globe-spanning communicable disease outbreak happened. (Doc. 19, ¶ 24). The world was overtaken by a new, highly transmittable strain of coronavirus, COVID-19. The virus, through its often debilitating and sometimes fatal effects, caused major and sustained disruptions across the United States.

The pandemic had an even harsher impact on Plaintiffs' nursing care facilities. COVID-19 infections and fatalities were more likely to occur in older or immunocompromised individuals. (*Id.* ¶¶ 25–26). And this was what happened at Plaintiffs' facilities. Hundreds of residents and employees contracted COVID-19 infections, resulting in severe sickness and, in some cases, death. (*Id.* ¶¶ 27–28).

Plaintiffs, and the government entities that regulated them, were aware of these dangers and took steps to monitor and ameliorate the spread of COVID-19 in their facilities. (*See Id.* ¶ 29). The Centers for Medicaid and Medicare Services issued requirements to nursing care facilities that included (1) restrictions to ingress/egress; (2) limitations on groups and individuals

---

[1] The policy effective dates are clear, but it is unclear when the agreement was formed. Presumably, the insurance agreement was negotiated and entered into at some point in the preceding year, 2019—before the nature and breadth of the COVID-19 pandemic became apparent.

permitted access to the facilities; and (3) other impediments to the management and operation of the facilities. (*Id.* ¶¶ 29–30).

More directly applicable to Plaintiffs claims here, in March 2020, the governors of Ohio and Michigan both issued executive orders declaring a state of emergency in their respective states. (*Id.* ¶ 33).

These orders were regularly revised based on cases and fatalities reported to the state governments, including those reported by Plaintiffs that occurred at Plaintiffs' facilities. (*Id.* ¶ 34–35). The orders and their revisions included additional guidelines and protocols that Plaintiffs' facilities needed to follow. (*Id.* ¶ 36).

The guidelines and protocols increased Plaintiffs' costs and expenses and impeded operation of their businesses, most significantly by restricting access to the facilities and by creating staffing shortages. Plaintiffs now seek to recover those costs and losses under their commercial insurance policies.

## Legal Standard

A motion to dismiss is properly granted if the plaintiff has "fail[ed] to state a claim upon which relief can be granted." Fed R. Civ. P. 12(b)(6). To survive a motion to dismiss, the plaintiff must allege facts that are sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. But I must accept the well-pleaded factual allegations in the

3

complaint as true and construe the complaint in the light most favorable to the plaintiff. *Hill v. Blue Cross & Blue Shield of Mich.*, 409 F.3d 710, 716 (6th Cir. 2005).

"[W]hen a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment." *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 335–36 (6th Cir. 2007). Here, the insurance policies and related documents attached to the Complaint are integral to Plaintiffs' claims.

### Discussion

Defendant's Motion to Dismiss calls for interpretation of the insurance policies it issued to Plaintiffs, covering Ciena's Michigan facilities and Laurel's Ohio facilities. Thus, a potential threshold matter arises: which state's law applies?

As a federal court sitting in diversity, I apply the choice-of-law principles of the forum state, Ohio. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *see also Troy Stacy Enters. Inc. v. Cincinnati Ins. Co.*, 2022 WL 2062001, at *2 (6th Cir. June 8, 2022). Ohio, in turn, analyzes conflicts of law issues under the "most significant relationship" test. *Ohayon v. Safeco Ins. Co. of Ill.*, 747 N.E.2d 206, 209 (Ohio 2001) (citing Restatement (Second) of Conflicts § 188 (1972)).

For there to be a conflicts analysis, however, there must first be a conflict. *Glidden Co. v. Lumbermens Mut. Cas. Co.*, 861 N.E.2d 109, 115 (Ohio 2006) ("[A]n actual conflict between Ohio law and the law of another jurisdiction must exist for a choice-of-law analysis to be undertaken.") (adopting Restatement (Second) of Conflicts § 1 cmt. b (1972)).

The parties do not raise any conflict between Ohio and Michigan contract law that would be relevant to this case. As the Sixth Circuit has noted in a different COVID-19 insurance

4

coverage case, "[b]ecause the states at issue employ the same principles of policy interpretation, there is no actual conflict that requires us to engage in a choice-of-law analysis." *Troy Stacy Enters., supra*, 2022 WL 2062001, at *2. Therefore, I apply Ohio contract law. *See id.* (applying Ohio law); *see also Santo's Italian Café, supra*, F.4th 398, 400 (6th Cir. 2021) ("In Ohio, as in all States (we expect), the state courts construe the terms of a contract in accordance with their conventional meaning.").

Under Ohio contract law, "[a]n insurance policy is a contract whose interpretation is a matter of law" for the courts to resolve. *See Lager v. Miller-Gonzalez*, 869 N.E.2d 666, 669 (Ohio 2008). In interpreting a policy, I must ascertain the intent of the parties and "settle upon a reasonable interpretation of any disputed terms in a manner designed to give the contract its intended effect." *Laboy v. Grange Indemn. Ins. Co.*, 41 N.E.2d 1224, 1227 (Ohio 2015).

I must give the language of the policy its ordinary meaning unless the ordinary meaning would result in some absurdity or if some other meaning is clear on the face of the contract. *Id.* I must construe any policy ambiguities strictly against the drafter—*i.e.*, the insurer—and liberally in favor of the insured. *Lane v. Grange Mut. Cos.*, 543 N.E.2d 488, 490 (Ohio 1989). "This rule, however, will not be applied so as to provide an unreasonable interpretation of the words of the policy." *Cincinnati Ins. Co. v. CPS Holdings, Inc.*, 875 N.E.2d 31, 34 (Ohio 2007).

Five policy terms are at issue here: (1) coverage for direct physical loss or damage to property; (2) the "Healthcare Specialized Endorsement" communicable disease contamination coverage; (3) crisis management coverage in the Ciena policy for the release or imminent release of a virus at the facilities; (4) the crisis management coverage through the liberalization clause in the Laurel policy; and (5) the "virus exclusion" in the Laurel policy.

1.  Physical Loss or Damage to Property

The First Amended Complaint attaches the Ciena and Laurel policies and restates the "relevant part[s]" in the Complaint itself. (Doc. 19, ¶¶ 18–19). These relevant parts include provisions in both policies that cover physical loss or damage to property as well as business income loss sustained due to physical loss or damage. (*Id.*). Plaintiffs do not allege that their physical property suffered damage or loss.

Defendant argues there is no coverage under the physical loss provisions because Plaintiffs have not alleged any loss of or damage to physical property. (Doc. 21, pgID 961–64). Plaintiffs respond that they do not need to allege physical damage to property because other policy provisions apply, including the Healthcare Specialized Endorsement and the crisis management coverage. (Doc. 22, pgID 1009–11).

Plaintiffs, then, do not contest that there was no physical damage or loss. Because physical damage or loss is a necessary condition of coverage under these sections of the policies, those coverages do not apply here. There was no such loss. *See Santo's Italian Cafe LLC v. Acuity Ins. Co.*, 15 F.4th 398, 401 (6th Cir. 2021) ("The [physical damage or loss provision] does not cover this loss. The [plaintiff's premises] has not been tangibly destroyed, whether in part or in full. And the owner has not been tangibly or concretely deprived of any of it. It still owns the [premises] and everything inside the space. And it can still put every square foot of the premises to use.").

COVID-19 knocked down no walls—leaving in its viral wake disease and death but no other destruction and devastation. This provision does not cover Plaintiffs' claims.

2.  Communicable Disease Contamination Coverage

Healthcare coverage endorsements under both policies provided additional coverage.

(Doc. 19, ¶¶ 18–19). The policy language across both is very similar. Ciena's policy states:

A.  COMMUNICABLE DISEASE CONTAMINATION COVERAGE

1.  We will pay for the actual loss of Business Income you sustain and the Extra Expenses you incur during the Period of Restoration when access to your Insured Premises is partially or totally prohibited by order of a government authority as the direct result of an outbreak of a Communicable Disease at an Insured Premises.

a.  The Period of Restoration begins at the time of the outbreak of a Communicable Disease, and ends the earlier of:

(1)  The time when access is permitted to your Insured Premises;
(2)  180 consecutive days after the order by the governmental authority; or
(3)  When the Communicable Disease Contamination Annual Aggregate Limit of Insurance shown in the Declarations is exhausted.

b.  We will also reimburse you for the actual costs that you incur to clean up, remove, restore, or replace contaminated Covered Property when required by the order due to the presence of a specific Communicable Disease at an Insured Premises.

(*Id.* ¶ 18).  Laurel's policy states:

B.  COMMUNICABLE DISEASE CONTAMINATION

Coverage: When a governmental health authority having jurisdiction over the "Insured Premises" has issued an order regarding an outbreak of a specific communicable disease at an "Insured Premises", we will pay for:

1.  The actual costs that you incur to clean up, remove, restore, or replace contaminated Covered Property when required by the order due to the presence of a specific communicable disease at an "Insured Premises"; and

2.  We also will pay for the actual loss of Business Income or Rental Income you sustain due to the actual impairment of your operations from the requirements of the order during the Period of Restoration at an "Insured Premises", if Business Income or Rental Income is covered under this policy.

(*Id.* ¶ 19).

7

Neither side disputes that COVID-19 qualifies under the policy as a "communicable disease." (*See* Doc. 22, pgID 1013). The dispute here concerns the policy language that coverage applies only when a government order is issued "as the direct result of" (Ciena) or "regarding" (Laurel) an outbreak "*at an Insured Premises.*" Defendant argues that coverage does not apply because the government orders were general, statewide orders that did not focus by name specifically on the circumstances *at* Plaintiffs' facilities, either generally or individually. (Doc. 21, pgID 964–65).

Plaintiffs counter that the language is ambiguous; the governors *did* issue their orders as a result of outbreaks at their facilities, at least in part. This is so because Plaintiffs reported infection statistics to government authorities, which the authorities in turn used to revise their orders. (*Id.*, pgID 1014–15).

Thus, there are dueling interpretations of the policy language. According to Defendant, the language means that the government order must be issued to address a specific communicable disease at a "specific location." (Doc. 21, pgID 964–65). In other words, there needs to be some indication in the order that the government issued it in response to Plaintiffs' facilities specifically and not in response to a general, statewide outbreak. (Doc. 23, pgID 1030–31).

According to Plaintiffs, another reasonable interpretation is that the government orders need not focus *solely* on outbreaks at their facilities so long as the government authorities knew of the facility infections and based their orders in some part on that information. (Doc. 22, pgID 1015).

If Plaintiffs' interpretation is reasonable, coverage exists. "[I]t will not suffice for [the insurer] to demonstrate that its interpretation is more reasonable than the policyholder's." *Perry*

*v. Allstate Indem. Co.*, 953 F.3d 417, 421 (6th Cir. 2020) (quoting *Andersen v. Highland House Co.*, 757 N.E.2d 329, 333 (Ohio 2001)). To defeat coverage, the insurer must show that its interpretation of the ambiguous term "is the only one that can fairly be placed on the language in question." *Andersen, supra*, 757 N.E.2d at 332.

A policy term is not ambiguous just because there are multiple ways to read it. *Dakota Girls, LLC v. Philadelphia Indem. Ins. Co.*, 17 F.4th 645, 652 (6th Cir. 2021). Instead, I must determine the terms' ordinary meaning "from other indicia, like the context of the broader policy." *Id.*

The Sixth Circuit's opinion in *Dakota Girls, supra*, is on point and controls my analysis. The policy language at issue in *Dakota Girls* is, for all relevant purposes, functionally the same as the policy language here. In the *Dakota Girls* insurance policy, the government order had to be "due directly to an outbreak of a communicable disease . . . that causes an actual illness at the insured premises." *Id.* at 651.

The Sixth Circuit concluded there was no coverage for two reasons. First, the plaintiff there did not plausibly allege that there was an "actual illness" at any of the insured premises. *Id.* That is not the case here. Plaintiffs have sufficiently alleged that there were outbreaks of COVID-19 at their facilities. According to the First Amended Complaint, "[h]undreds of cases of COVID-19 were diagnosed among residents and employees of the facilities," and "[h]undreds of residents at the facilities experienced severe sickness and death as a result of COVID-19." (Doc. 19, ¶¶ 27–28). Plaintiffs here have plausibly alleged that there was an actual illness or outbreak at their facilities.

But Plaintiffs cannot overcome the second reason why the Sixth Circuit concluded there was no coverage in *Dakota Girls*. The court concluded that, even if the plaintiff had shown an

actual illness or outbreak, it still "never plausibly pleaded that the statewide shutdown order was 'due directly' to anything that happened at its 'insured premises.'" *Dakota Girls*, 17 F.4th at 651.

This conclusion is fatal to Plaintiffs' coverage claims here under the communicable disease provisions. The policy language is not identical to *Dakota Girls*, but importantly, it still requires a causal connection between the order and an outbreak *at* an insured premises.

*Dakota Girls* defeats Plaintiffs' contention that the government orders were issued in part based on infection statistics Plaintiffs reported to the authorities in Ohio and Michigan. Plaintiffs could not have alleged that the government orders arose directly, "or even indirectly," from an outbreak at their facilities. *See id.* at 652. This is because the government orders were "framed in general terms" and applied to all facilities statewide. *See id.* Further, the government orders were not remedial, issued in response to an outbreak found at a specific facility. The orders were instead "couched as a prophylactic measure 'to avoid an imminent threat with a high probability of widespread exposure to COVID-19[.]'" *See id.*[2]

Other cases dealing with similar policy language and similar government orders have reached the same result. In *Wild Eggs Holdings, Inc. v. State Auto Property & Casualty Insurance Company*, the Sixth Circuit also held that the Kentucky government orders did not have their origin in any exposure at the plaintiff's properties "but in a general statewide concern for the spread of COVID-19." 48 F.4th 645, 650 (6th Cir. 2022).

*Wild Eggs* recognized that "a direct proximate causal connection" was not required; however, there still needed to be "some causal relation or connection" between the outbreak at a

---

[2] The parties do not include the specific state government orders or quote from their specific language. The First Amended Complaint only alleges that the Ohio and Michigan governors issued executive orders that declared a state of emergency "across the state" and that these orders "were regularly revised." (Doc. 19, ¶¶ 33, 35). Therefore, I assume that the statewide orders at issue here are, for all relevant purposes, the same as those at issue in *Dakota Girls—i.e.*, that the government orders applied generally and statewide and that they were implemented as a prophylactic measure against the spread of COVID-19.

covered facility and the government order. *Id.* The Sixth Circuit held that no such connection existed under the similar policy language for the same reason that Plaintiffs here fail to show a connection: "there is no mention [in the order] of an exposure at [the covered facilities]" and the government orders were "prophylactic measures intended to curb generally the spread of COVID-19 statewide." *Id.*

An Eastern District of Michigan case dealing with the same issue provides further illustration of this point. In *Salon XL Color & Design Group, LLC v. West Bend Mutual Insurance Company*, the plaintiff argued that because the COVID-19 outbreak was statewide, the Michigan governor must have issued the orders in part due to an outbreak at plaintiff's property since the property is within the state. 598 F. Supp. 3d 590, 596 (E.D. Mich. 2022). Plaintiffs here argue similarly that the government orders "were issued, at least in part, based on COVID-19 cases that occurred at Plaintiffs' facilities." (Doc. 22, pgID 1015).

Citing the Sixth Circuit in *Dakota Girls*, the *Salon XL* court found this insufficient; the plaintiff did not show that the governor's order was *due to* an outbreak *at* the covered premises. *Salon XL*, 598 F. Supp. 3d at 596. Put another way, the governor still would have issued the same executive order even if plaintiff did not exist because the order addressed a general, statewide outbreak—not an outbreak at the plaintiff's premises. *Id.*

Ultimately, there is no ambiguity in the communicable disease coverage that would allow me to consider and construe Plaintiffs' version. "Ambiguity in an insurance contract is construed against the insurer and in favor of the insured. This rule, however, will not be applied so as to provide an unreasonable interpretation of the words of the policy." *Cincinnati Ins. Co. v. CPS Holdings, Inc.*, 875 N.E.2d 31, 34 (Ohio 2007).

Plaintiffs' interpretation effectively removes from the policy the requirement that the facility outbreak must cause the government order. Under Plaintiffs' formulation, the policy would always cover a government order issued in response to any statewide outbreak. Any infections anywhere—not necessarily including those at Plaintiffs' facilities—could have factored into the government order's calculus and contours. But the policy language requires more. It requires that the order be issued "as the direct result of" or "regarding" an outbreak "at an 'Insured Premises.'" (Doc. 19, ¶¶ 18–19). An order regarding a general outbreak occurring statewide is insufficient to trigger the policy.

Plaintiffs have not alleged that the Ohio and Michigan governors issued their orders to address outbreaks at Plaintiffs' premises. Plaintiffs' allegations only indicate that the orders addressed the statewide COVID-19 pandemic. Therefore, Plaintiffs' losses are not covered under the communicable disease provisions in the Ciena and Laurel policies.

### 3.  Crisis Management Coverage (Ciena)

Ciena's policy also contains coverage for losses sustained as a result of a crisis event. The policy states:

4. Crisis Management

We will pay the actual Business Income loss you sustain and Extra Expense you incur due to a Crisis Event. Coverage begins at the time of the Crisis Event and ends the earlier of:

    a.  The time that the Insured Premises could be reopened for business; or
    b.  The number of consecutive days (shown in the Declarations) after the date of the Crisis Event.

[. . .]

SECTION VI.  DEFINITIONS
[. . .]

J.5.  Crisis Event also includes:

12

[. . .]

e.  The release or imminent release of bacteria or virus that is likely to result in bodily injury or death . . . to persons at an Insured Premises[.]

(Doc. 19, ¶ 18).

Defendant argues that the coverage does not apply because Ciena did not close its facilities and Ciena's losses were not due to the virus but were instead due to the government orders restricting their operations. (Doc. 21, pgID 969). Plaintiffs argue that there is coverage because the policy language did not require facility closure and COVID-19 *did* trigger the crisis coverage. (Doc. 22, pgID 1018–19).

Unlike the communicable disease coverage, the crisis management coverage does not require, and is in fact silent regarding, any government order restricting operations. The coverage under this provision only requires that the business income loss and expense be incurred "due to a Crisis Event" like "the release or imminent release of bacteria or virus that is likely to result in bodily injury or death . . . to persons at an Insured Premises."

Plaintiffs have sufficiently alleged that they suffered loss due to the release or imminent release of COVID-19. "Hundreds of cases of COVID-19 were diagnosed among residents and employees of the facilities" and "[h]undreds of residents at the facilities experienced severe sickness and death . . . ." (Doc. 19, ¶¶ 26–27). The facility residents were also uniquely susceptible to COVID-19 infections because they were elderly or infirm. (*Id.* ¶¶ 25–26).

As a result of the dangers presented by the "release or imminent release" of COVID-19, Plaintiffs adopted protocols that impaired their operations, restricted access to their facilities, and increased their operational costs. (*Id.* ¶ 37).

To be sure, Plaintiffs implemented these protocols as a result of government orders. It is also equally true Plaintiffs did so due to the "release or imminent release" of COVID-19. After all, the governors issued their orders in response to the actual and imminent release of the virus. It follows then that the Plaintiffs implemented their protocols in response to that same virus.

Defendant is asking me to read an exclusion into the policy—that there is no coverage if a government authority also intervenes in the crisis event. The policy contains no such exclusion, and I cannot rewrite the policy to include it. "The insurer, being the one who selects the language in the contract, must be specific in its use; an exclusion from liability must be clear and exact to be given effect." *Lane v. Grange Mut. Cos.*, 543 N.E.2d 488, 490 (Ohio 1989).

Further, the crisis management coverage does not require closure of the facilities, regardless of how one defines that term. The language only requires that the loss be "incur[ed] due to a Crisis Event." (Doc. 19, ¶ 18).

Defendant points to one disjunctive part of the coverage time limitation clause to argue that coverage only exists if the business is closed.[3] That is one reading of the time limitation clause, but the clause also provides coverage beginning "at the time of the Crisis Event and end[ing] [at] . . . [t]he number of consecutive days (shown in the Declarations) after the date of the Crisis Event." (*Id.*).

The time limitation clause does not say whether coverage exists; that is what the "Crisis Event" clause does. Rather, the time limitation clause assumes that coverage exists in the first

---

[3] It is unclear what "closed" means in this context. Both parties have provided definitions on what it means to be "closed" or "open" for business generally. (Doc. 22, pgID 1019; Doc. 23, pgID 1033). Neither side explains, however, what that means for a long-term nursing care facility where the "customers" are also the residents. If the policy language requires business closure, does that mean Plaintiffs must kick out their residents before coverage kicks in? Or can a nursing care facility be "closed" by limiting access to other persons while providing additional care to residents in light of the closure?

14

instance, and it then proceeds to explain when that coverage begins and ends in the second instance.

Defendant provides a reasonable interpretation of the crisis management provision. But so do the Plaintiffs. "[T]o defeat coverage, the insurer must establish not merely that the policy is capable of the construction it favors, but rather that such an interpretation is the only one that can fairly be placed on the language in question." *Andersen v. Highland House Co.*, 757 N.E.2d 329, 332 (Ohio 2001) (cleaned up).

Because I must construe this policy ambiguity liberally in favor of Plaintiffs, I find that Ciena's applicable losses are covered under the crisis management section of its policy. *See Lane, supra*, 543 N.E.2d at 490.

### 4. Crisis Management Coverage (Laurel)

Laurel's policy does not expressly include a crisis management provision. However, Laurel's policy includes a liberalization clause that states: "If we adopt any revision that would broaden this Coverage Part, without additional premium, within 45 days prior to inception of this policy or during this policy period, the broadened coverage will immediately apply to you." (Doc. 1-2, pgID 169).

According to Plaintiffs' allegations, "Defendant agreed to provide the broader more 'enhanced' coverage" in the event Laurel's policy form differed from Ciena's. (Doc. 19, ¶ 8). Plaintiffs referenced and attached in the Complaint an email from Defendant's agent reflecting the alleged agreement and acknowledgment. (Doc. 1-3). The email subject was "Liberalization Clause - Laurel Health Care Holdings," and the Defendant's agent stated:

> Per our conversation our new form was introduced for new business effective 1/1 and renewal business 7/1 so that we would have adequate time to notify or existing customers of the change hence the reason for the different forms on Laurel and Ciena. *That said all of our customers get the benefit of the enhanced*

> *coverage in the new form through the Liberalization extension*. Our plan would be to move Laurel over to the new form at the next renewal. However we are open to discussing a plan with the client once we get through July.

(*Id.*) (emphasis added).

Defendant argues that Plaintiffs are mischaracterizing the email, but Defendant does not explain how. (Doc. 22, pgID 1035). Defendant instead rests on their belief that no coverage exists under either policy, so I therefore do not need to analyze the liberalization clause. (*Id.*, pgID 1031). But the crisis management coverage in the Ciena policy *does* apply, and Plaintiffs have sufficiently alleged that Defendant provided the enhanced crisis management coverage in the Ciena policy to Laurel through the liberalization clause.

Defendant has not provided any argument to the contrary, despite Plaintiffs' allegations and arguments in support of the liberalization extension. "A party waives opposition to an argument by failing to address it in [their] responsive brief." *Wood v. U.S. Bank Nat'l Ass'n*, 2019 WL 1255229, at *3 (N.D. Ohio Mar. 19, 2019) (Adams, J.).

Therefore, for the purposes of this Motion, Plaintiffs have sufficiently alleged that Defendant provided the enhanced crisis management coverage in the Ciena policy to Laurel through the liberalization clause. Laurel is covered under the crisis management provisions for the same reasons as Ciena.

### 5. Virus Exclusion (Laurel)

Last, Defendant argues that the virus exclusion in Laurel's policy otherwise bars any coverage for Laurel. Laurel's policy states:

> A. COVERED CAUSES OF LOSS
>
> Covered Causes of Loss means direct physical loss or direct physical damage that occurs during the Policy Period and in the Coverage Territory unless the loss or damage is excluded or limited in this policy.

16

B. EXCLUSIONS

1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss or damage:

f. "Fungus", Wet Rot, Dry Rot, Bacteria or Virus

Presence, growth, proliferation, spread or any activity of "fungus," wet rot, dry rot, bacteria or virus. But if direct physical loss or direct physical damage to Covered Property by a "Specified Cause of Loss" results, we will pay for the resulting loss or damage caused by that "Specified Cause of Loss". This Exclusion does not apply:

> (1) When "fungus," wet rot, dry rot, bacteria or virus results from fire or lightning; or
> (2) To the extent that coverage is provided in the Coverage Extension(s) – "Fungus, Wet Rot, Dry Rot, Bacteria or Virus - Limited Coverage with respect to loss or damage by a cause of loss other than fire or lightning.

(Doc. 1-2, pgID 175–76). According to Defendant, the virus exclusion bars coverage for any of Laurel's COVID-19–caused losses.

Defendant relies in part on *Dana Inc. v. Zurich American Insurance Company*, 2022 WL 2452381 (6th Cir. July 6, 2022). In *Dana*, the Sixth Circuit held that a virus exclusion defeated coverage because the policy only insured losses "directly resulting from *physical loss or damage* of the type insured . . . to property described elsewhere in this Policy and not otherwise excluded by this Policy." *Id.* at *3 (emphasis added). As the policy in *Dana* expressly excluded virus contamination, there was no coverage for virus-related losses. *Id.*

*Dana* and the other cases Defendant cites on this point all concern a virus exclusion under the "physical loss or damage" provisions of an insurance policy. *See Nail Nook v. Hiscox Ins. Co. Inc.*, 182 N.E.2d 356, 359 (Ohio 8th Dist. Ct. App. 2021) (interpreting virus exclusion under the "direct physical loss of or physical damage" coverage); *Q Clothier New Orleans, L.L.C. v. Twin City Fire Ins. Co.*, 29 F.4th 252, 255 (5th Cir. 2022) (same); *ABC Diamonds Inc.*

17

*v. Hartford Cas. Ins. Co.*, 2022 WL 1830692, at *2 (7th Cir. June 3, 2022) (same); *Sys. Optics, Inc. v. Twin City Fire Ins. Co.*, 2021 WL 2075501, at *8 (N.D. Ohio May 24, 2021) (Lioi, J.) (same).

As discussed above, Plaintiffs did not sufficiently allege physical damage or loss of the property, leaving them without coverage under those provisions. Therefore, there is no virus exclusion to apply since there is no physical loss or damage that triggers it in the first place. The coverage provision in play here, the crisis management coverage, does not require physical loss or damage to property, and therefore the virus exclusion is inapplicable.

Further, because Laurel's policy, through the liberalization clause, contained expanded coverage for crisis management, that endorsement supersedes any previous conflicting policy language. *Pierson v. White Pine Ins. Co.*, 194 N.E.3d 765, 780 (Ohio 4th Dist. Ct. App. 2022) ("[C]ourts have recognized that endorsements by their very nature are designed to trump general policy provisions. Consequently, when a conflict exists between provisions in the main policy and the endorsement, the endorsement prevails.") (cleaned up); *see also BP Chemicals, Inc. v. First State Ins. Co.*, 226 F.3d 420, 426 (6th Cir. 2000) ("[E]ndorsements generally supersede and control over conflicting provisions of a policy.") (applying Texas law). As the liberalization clause entitles Laurel to the benefit of the broadened coverage in the crisis management provision for virus crisis events, this coverage prevails over any virus exclusion in Laurel's original policy form.

For this additional reason, the virus exclusion in the Laurel policy does not extend to the broadened coverage for crisis management and is thus inapplicable.

18

## Conclusion

It is, accordingly, hereby

ORDERED THAT

1. Defendant Hartford Fire Insurance Company's Motion to Dismiss (Doc. 21) be, and the same hereby is, denied.

2. The Clerk shall forthwith schedule a Zoom status/scheduling conference; not later than ten days before that conference, the parties shall submit a proposed timetable for discovery and motion practice and, if needed, an agreed Protective Order.

SO ORDERED.

/s/ James G. Carr
Sr. U.S. District Judge